UNITED STATES DISRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------------
FRANCISCO SURIEL,

                         Plaintiff,

  - against -

PORT AUTHORITY OF NEW YORK AND NEW JERSEY;
PORT AUTHORITY POLICE DEPARTMENT; Police Officer
ANDREW SAMUEL, Shield No. 3331; Police Officer
JEREMY KHAN; Sergeant JOSEPH OPROMALLA; Police
Officer BRETT TELESFORD; JOHN DOE, as Administrator
of the Estate of ROBERT JONES; JOHN and JANE DOE 1-10,
Defendants.
----------------------------------------------------------------------------

Index No.: 1:19-cv-03867
(PKC)(ST)

**DEFENDANTS' RULE 56.1 STATEMENT**

Defendants, The Port Authority of New York and New Jersey ("the Port Authority"), Police Officer Andrew Samuel, Police Officer Brett Telesford, Police Officer Jeremy Kahn and Sergeant Joseph Opromalla by their undersigned attorneys for their Fed. R. Civ. P. 56.1 Statement in support of their motion for partial summary judgment state as follows:

### A) Parties

1. The Port Authority is a bi-state governmental agency created by compact between the States of New York and New Jersey. (N.Y. Unconsol. Laws § 6401 *et seq.*; N.J. Statute Ann. §§ 32:1-118).

2. The Port Authority has a Port Authority Police Department ("PAPD") that employs uniformed officers, including the named defendants. (Second Amended Complaint ¶¶ 10-11).

3. In 2018, The Port Authority operated John F. Kennedy International Airport ("JFK") pursuant to its statutory authority and its lease agreement with the City of New York (*AAA Northeast* v. *The Port Authority of New York and New Jersey*, 221 F. Supp. 3d 374, 376 (S.D.N.Y 2016); N.Y. Unconsol. Laws § 6401 *et seq.*).

4. On August 6, 2018, Police Officer Andrew Samuel ("P.O. Samuel") was a uniformed officer employed by the Port Authority and assigned to JFK Airport. On that day he was working in plainclothes "Hack" patrol to prevent the unlawful solicitation of airport patrons by taxis. (Deposition of P.O. Samuel, dated November 20, 2020 (" P.O. Samuel tr.") pp. 9, 28-30).

5. P.O. Samuel is a black male, 6' 3", who was 32 years old on August 6, 2018 and had 7 years' experience in the PAPD, where he had made over 150 arrests and had worked plainclothes over a hundred times (P.O. Samuel tr. pp. 13,18,35; P.O. Samuels' Porth Authority Self-Identification Questionnaire).

6. On August 6, 2018, P.O. Samuel was dressed in shorts and a t-shirt. He carried his shield, a firearm, and a police radio. He was assigned to Hack 1 with Police Officer Brett Telesford. He has never been sued before. (P.O. Samuel tr. pp. 15, 18, 30, 33,37; P.O. Samuel Memo Book 8/6/18).

7. On August 6, 2018, Police Officer Brett Telesford ("P.O. Telesford") had been employed by the PAPD for four years and had worked the plainclothes "Hack" detail over 40 times. He has never been sued before. (Deposition of Brett Telesford, dated April 30, 2021) (" P.O.Telesford tr.") pp. 10-12,17-22).

8. On August 6, 2018, P.O. Telesford was assigned to work with P.O. Samuel in the plain-clothes "Hack" detail. They were assigned an unmarked vehicle to patrol the airport terminals for "hustlers". (P.O. Telesford tr. pp.17-22,25-27; P.O. Telesford Memo Book 8/6/18).

9. P.O. Telesford is a black male, 6' 1', 230-240 lbs., who was 29 on August 6, 2018 (P.O. Samuel tr. p. 35; P.O. Telesford's Police Academy Contact Information Form).

10. When he works plainclothes, P.O. Telesford carries his shield, firearms, handcuffs and a radio, but he only shows his shield when he makes contact with a subject. (P.O. Telesford tr. pp.17-22)

11. On August 6, 2018, Police Officer Jeremy Kahn was employed as a uniformed police officer in the PAPD where he had been working for 7 years. He was assigned to work in a sector car patrolling the airport during the 2-10 tour on that date. (Deposition of Police Officer Jeremy Kahn, dated January 14, 2021 ("P.O. Kahn tr.") pp.18-19, 21, 24).

12. P.O Kahn has no recollection of plaintiff, Francisco Suriel, ("Suriel") and his Memo Book has no entry relating to Suriel's arrest. It shows that he was at Terminal 9 at 5:25 p.m. at the time of Suriel's arrest at Terminal 8. (P.O. Kahn tr. p. 14; P.O. Kahn's Memo Book 8/6/18).

13. P.O. Kahn's Memo Book shows that he held over and transported a prisoner from Building 269, the PAPD command at JFK, to Queens Central Booking at 2330 hours on August 6, 2018. (P.O. Kahn tr. pp. 30-31; Kahn Memo Book 8/6/18).

14. Sergeant Joseph Opromalla ("Sgt. Opromalla") had been employed by PAPD for 7 years as of August 6, 2018. He was the "Hack" supervisor at JFK Airport on August 6, 2018. (Deposition of Sgt Opromalla, dated December 16,2020 (" Sgt. Opromalla tr") pp. 9, 23)

15. Sgt. Opromalla was not present at the scene of the arrest of Suriel at Terminal 8 at JFK Airport on August 6, 2018, (P.O. Samuel tr. pp. 78, 143). Opromalla learned of the arrest over the radio. (Sgt. Opromalla tr. p. 23)

16. Sgt. Opromalla spoke to P.O. Samuel about the arrest at Building 269 at JFK (Police Command) to verify that there was probable cause for the arrest and he was satisfied with P.O. Samuel's explanation that he overheard Suriel offering taxi services to a woman who declined to give her identity, because she didn't want to get involved. (Sgt. Opromalla tr. pp. 42-49, 56-59).

17. Sgt. Opromalla reviewed the form prepared by P.O. Samuel on the use of force in which it is stated that he had used a compliance hold to remove Suriel from his vehicle. (Sgt. Opromalla tr. p. 68; P.O. Samuel tr. pp. 208, 210; Arrest Report, Bates PA 00010-11).

18. Suriel is a male Hispanic, who was 50 years old on August 6, 2018 and weighed 150 lbs. He resided at 217 52nd Street in Brooklyn, New York. (On-Line Booking Sheet for Suriel's arrest).

19. Suriel was born in the Dominican Republic and moved to the United States in 1992 where he worked various jobs, including a member of a band, as a cook in restaurants, as a barber and 2000-2007 as a livery driver to the New York Metro Airports for Elegant Car Service. (Deposition of Francisco Suriel, dated November 18, 2020 ("Suriel tr.") pp. 4-33.

20. On August 6, 2018, Suriel was driving a 2008 Honda Odyssey minivan as a taxi for a rideshare service company called Via.  (Suriel tr. pp. 19-26).

### B) Rideshare Services At JFK And Plaintiff's Taxi

21. Rideshare services are permitted at JFK Airport, but they have designated pick-up areas at the terminals (P.O. Samuel tr. p. 91).

22. On August 6, 2018, Suriel was working as an independent contractor with Flatiron Inc., a subsidiary of Via, a rideshare company that operates through an App. that both drivers and customers have on their cell phones.  (Deposition of Stephen Kendall, director of driver operations at Via. dated April 22, 2021 ("Kendall tr.") pp.8, 11, 22)

23. Suriel entered into a contract to be a Via driver on January 26, 2018 (Flatiron contract Bates No. Via 00010008).

24. When a ride is booked by a customer through the Via App. , the customer is given the make, model and license plate of the vehicle that will pick him/her up together with the first name and first initial of the last name of the driver of the vehicle. (Kendall tr. pp. 25-26).

25. The driver of a vehicle working for Via is given information through the App. including the identity of the passenger being picked-up and the time and exact location of the pick-up. (Kendall tr. p. 36).

26. Via records show that on August 6, 2018, Suriel was assigned a passenger pick-up at Terminal 8 (American Airlines) arrival area.  The call for a pick-up was received at 16:46 (4:46 p.m.) with an assigned estimated pick-up time of 16:56 (4:56 p.m.). The  passenger had a 4-week commuter pass. (Via records, Bates Nos. Via 0015-0016; Kendall tr. pp 81-82, 101, 103, 110).

27.  Suriel was a Blue Mode driver during the week of August 6, 2018, which meant that he was being paid by the hour to be on the Via platform. (Kendall tr. pp. 28, 33). Suriel's earnings from Via for the week of 8/6/2018-8/12/2018 were $1,470.70. (Kendall tr. pp 61-62).

28.  When the driver arrives at the location, the Via App. gives the driver an actual identifier. (Kendall tr. pp. 27, 30).

29.  When a call comes from a prospective passenger, Via assumes the passenger is ready for pick-up. (Kendall tr. p. 43).

30.  A Via driver has to wait 1-4 minutes at the location before he/she can mark the passenger as a "no-show" on the App. (Kendall tr. pp 44, 47-48).

31. Blue Mode drivers cannot cancel a trip. Any cancellation has to be made by the passenger. ( Kendall tr. p 33).

32.  The Via records show that the 16:46 call for a pick up at Terminal 8 assigned to Suriel was canceled at 18:02 (6:02) p.m. (Kendall tr. 105,120; Via record , Bates No. Via 00016).

### C) The Arrest

33.  P.O. Telesford was driving an unmarked vehicle around the airport with P.O. Samuel on August 6, 2018 to combat a "hustler" condition at JFK in which taxi drivers unlawfully solicit JFK patrons. (P.O. Telesford tr. 17-22, 28-32, 43-48).

34. NYS Vehicle and Traffic Law § 1220-b, Unlawful Solicitation of Ground Transportation Services provides in relevant part: "[u]nlawfully solicit ground transportation at

5

an airport, when, at an airport, such person without having been authorized to do so by the airport operator, or without having made a prior agreement to provide ground transportation services to a specific patron, engages or offers to engage in any business, trade or commercial transaction involving the rendering to another person of any ground transportation services from such airport."( McKinney's VTL 1220-b).

35. Violation of NYS VTL § 1220-b was a misdemeanor crime in 2018, but it was changed to a violation as part of the Bail Reform Act.  (P.O. Telesford tr. pp 41-42; Sgt. Opromalla  tr. p. 37; P.O. Samuel tr. p 180-181).

36. Suriel testified that when he arrived at Terminal 8 for his passenger pick-up, there were a lot of people there, but his passenger was not in the pick-up area. (Suriel tr., pp 110, 114).

37. P.O. Telesford and P.O. Samuel observed Suriel in his vehicle in the Terminal 8 arrivals roadway pull up in front of a woman and speak to her through the open window of his vehicle.  They saw her shake her head indicating "no". (P.O. Telesford tr. pp. 64-75).

38. P.O. Telesford testified that they observed Suriel drive away and they drove away thereafter, but circled back to the arrivals area in front of Terminal 8, where they once again saw Suriel stopped in the roadway in front of the same woman. ( P.O. Telesford  tr. pp. 64-75).

39.  P.O. Samuel exited the vehicle and stood near the woman he and Telesford had previously observed Suriel speaking to through the open window of his vehicle. ( P.O. Samuel tr. p.84; P.O. Telesford tr. pp. 69-75).

40.  P.O Samuel reported that he overheard Suriel asking the woman: " [d]o you need a taxi?" and the woman told him "no" and was shaking her head indicating "no." (P.O. Samuel tr. p. 84; P.O. Telesford tr. pp.76-83; Arrest Report, narrative section, Bates No PA-00010-11).

41.  Suriel's vehicle was 50'-60' feet away from the rideshare passenger pick-up area at Terminal 8 when he was observed talking to the woman. (P.O. Samuel tr. p. 92).

6

42. P.O. Samuel approached Suriel's vehicle with his shield around his neck and told Suriel to put the car in park and that he was a police officer, that he was under arrest. (P.O. Samuel tr. pp. 99-101).

43. Suriel admits the officers told him to step out of the vehicle. (Deposition of Francisco Suriel, dated May 6, 2021, tr. pp. 248-249).

44. P.O. Telesford and P.O. Samuel told Suriel to step out of the vehicle multiple times and he refused, so the two officers physically removed him from his vehicle using a compliance hold on his upper arms. (P.O. Samuel tr. pp 104-106, 113-115; P.O. Telesford 93-100, 110-114; Arrest Report, Bates Nos. PA 00010-11).

45. After he was removed from the vehicle, Suriel was placed in handcuffs. (P.O. Samuel tr. pp 124-126).

46. The time of the arrest was 17:25 (5:25 p.m.). (On-line Booking Sheet, Bates Nos. PA-00006-00008).

47. Uniformed officers arrived and transported Suriel to Building 269 where the JFK Police Command is located. (P.O. Telesford tr. pp 126-132; Sgt. Opromalla tr. p 77; P.O. Samuel tr. p 163).

48. P.O. Samuel was the arresting officer and he prepared the arrest paperwork including the On-line Booking Sheet and the Arrest Report which stated that he had overheard Suriel offering taxi services to a woman, but the woman declined to give her identification because she didn't want to get involved. (P.O. Samuel tr. p. 74, On-Line Booking Sheet Bates Nos. PA 00006-8; Arrest Report Bates Nos. PA-00010-11).

49. As part of the arrest process, P.O. Samuel took a color photograph of Suriel's head, which shows that he is bald and that he had no scrapes or cuts on his face or head. (Arrest photo, Bates No. 00009).

7

50. P.O. Samuel was able to communicate with Suriel in English during the arrest process and Suriel answered in English. ( P.O. Samuel tr. pp. 138, 147).

51. Suriel was offered the opportunity to make a telephone call by Samuel, but he declined. (P.O. Samuel tr. 52).

52. The Criminal Complaint which was drawn up by the Assistant District Attorney charged Suriel with PL 205.30 Resisting Arrest and VTL 1220-b, Unlawful Solicitation of Ground Transportation. (Criminal Complaint, Bates Nos. 00004-00005; Sgt. Opromalla tr. p. 68; P.O. Samuel tr. pp. 245-247).

53. Suriel was not given a desk appearance ticket. The decision whether to give a desk appearance ticket is made by the Tour Commander. (P.O. Samuel tr. p. 234).

54. When Suriel arrived at Building 269, he requested medical attention and Sgt. Opromalla made a request for EMTs to Jamaica Hospital ( Sgt. Opromalla tr. pp. 61-63; P.O. Samuel tr. pp. 183-187).

55. The CAD Report states that the prisoner was requesting EMS for high blood pressure. (CAD Report, Bates PA-00028).

56. EMTs Luz Sanchez and Mathew Lindstadt from Jamaica Hospital arrived and met Suriel in his cell and prepared a Prehospital Care Summary Report. Ms. Sanchez spoke Spanish and they took Suriel's vital signs and asked him questions about his physical condition. (Deposition of Luz Sanchez, dated March 16, 2021 (" Sanchez tr.") pp. 35-36, 56-59, 79; Deposition of Matthew Lindstadt dated July 2, 2021 ("Lindstadt tr").pp. 21-30

57. The Prehospital Care Summary Report is signed by Luz Sanchez, Mathew Lindstadt and Suriel ( Prehospital Care Report Summary p. 3; Lindstadt tr. p 20).

58. The Prehospital Care Summary Report states that Suriel reported he has no pain. The Report states: "PAPD called for a prisoner who complained about his blood pressure being

8

elevated after being placed under arrest. Upon arrival met in holding cell offering no complaints. He states he was excited and worked up after a verbal altercation with law enforcement. He said he is fine now and refuses further medical evaluation or transport to a hospital of his choosing. RMA signed and witnessed." (Prehospital Care Summary Report).

59. Suriel was removed from his cell at 2326 and transferred to Queens Central Booking (P.O. Samuel tr. p. 194; Cell Log Bates No. PA-00002).

60. When a prisoner is transferred to the New York City Police ("NYPD"), the prisoner must first undergo a pre-arraignment screening by FDNY EMTS. (Deposition of Lt. Grant Simmons, FDNY, dated September 29, 2021 ("Lt. Simmons tr.") pp. 413-414).

61. EMTs Richard DelMonico and Jennifer Aguiluz were the two EMTs assigned to the screening unit at Queens Central Booking on Tour 1 beginning at 10 pm. (Lt. Simmons tr. p 22).

62. A NYC Correctional Health Services Pre-Arraignment Screening Form was prepared by the FDNY EMTs for Francisco Suriel, DOB 12/15/67 and time stamped August 7 at 12:21 a.m. (The Pre-Arraignment Screening Form).

63. Richard DelMonico testified that he recognized the handwriting on the form as being that of Jennifer Aguiluz and it has her shield No. 3022 on the form. She speaks Spanish. (Deposition of Richard DelMonico, dated July 29, 2021 ("DelMonico tr.") pp. 9, 25-26).

64. DelMonico testified that if the EMTs observed that someone was injured they would note the injury on the form. (DelMonico tr. p 31).

65. The Prearrangement screening form question #1 is "Are you sick or injured" and the box on the form that is checked is "no". (Prearrangement Screening Form).

66. DelMonico testified that if the prisoner speaks Spanish the questions are translated into Spanish (DelMonico tr. pp. 31-32).

67. DelMonico testified that a prisoner is only sent to the hospital upon request, but if the prisoner requests it the prisoner will be sent to the hospital. (DelMonico tr. p. 36).

68. Suriel was released at 6 p.m. on August 7, 2018 (Suriel tr. p. 279).

### D) Suriel's Post Arrest Conduct

69. Suriel retained an attorney to represent him in the civil and criminal matters about ten days after his arrest (Suriel tr. pp.150-151).

70. On August 16, 2018, Suriel's attorneys in this action sent a letter to the Port Authority demanding that it preserve all video tapes surrounding Francisco Suriel's "accident" at around 3 p.m. at Terminal 8 arrivals at JFK. The letter requested preservation of all video 12 p.m. - 6 p.m. at that location. (Letter of August 16, 2018).

71. On August 17, 2018, Suriel went to the emergency room at NYU Langone Hospital in Brooklyn complaining of headaches, and leg and chest pain after being struck by federal agents 3 days prior. The record states there is no sign of injury and that there is no back pain being complained about. (NYU Langone Medical Record dated August 17, 2018).

72. The August 16 letter from Suriel's counsel was stamped received by the Port Authority Office of the Secretary on August 22 and it was sent to Caroline Ioannou in the Law Department, who issued preservation notices on August 28 to the Director of the Aviation Department and the Superintendent of Police. She was informed that the Port Authority did not have any cameras in the arrivals area at Terminal 8. (Deposition of Caroline Ioannou dated September 16, 2020 ("Ioannou tr.") pp. 10, 12, 14, 19, 36, 41).

73. Kim Dickie, the airport security manager at JFK, testified that the Port Authority does not have cameras that photograph the arrivals roadway at terminal 8 at JFK. She testified that there were cameras on the departures roadway, but the camera did not pick up any portion of the arrivals roadway below because it was blocked by the upper roadway. (Deposition of Kim

Dickie, dated September 16, 2020 ("Dickie tr.") pp. 8, 13-14, 18-22; photographs of the upper departures roadway).

74. Terminal 8 is operated and maintained by American Airlines pursuant to a lease with the Port Authority. (American Airlines Lease AYB--085R, Bates Nos. PA 1419-2037).

75. American Airlines has surveillance cameras in the arrivals area at Terminal 8 and the recordings are kept for 30 days. (Deposition of Bob Davis, global security investigator for American Airlines dated April 23, 2021 ("Davis tr. ") pp. 7-10.

76. The Port Authority police do not have permission to look at the video without Bob Davis' permission. (Davis tr. p. 18).

77. American Airlines would require the Port Authority to have a subpoena to get a copy of the video. (Davis tr. p. 13).

78. Davis did not know if the cameras at American Airlines Terminal 8 at JFK in the arrivals area were operational on August 6, 2018. (Davis tr. p 26).

79. Davis was not notified by Suriel's attorney to preserve video and he never received a subpoena from Suriel's attorneys for any video recording (Davis tr. pp. 28-30).

80. The Criminal charges against Suriel were Adjourned in Contemplation of Dismissal on February 20, 2019 (Certified Copy of the Criminal Court of the City of New York, Queens County).

81. P.O. Samuel was never contacted by the District Attorney during the prosecution (P.O. Samuel tr. pp. 260-261).

Dated : New York, New York
       May 9, 2022

                              The Port Authority Law Department
                              Attorneys for Defendants


                            By:   /s/ Kathleen Gill Miller
                              Kathleen Gill Miller, Esq.
                              Christopher Valletta, Esq.
                              4 World Trade Center
                              150 Greenwich Street, 24th Floor
                              New York, New York  10007
                              Phone: (212) 435-3434



TO:    Elefterakis, Elefterakis & Panek
           Gabriel P. Harvis, Esq.
           Baree Fett, Esq.
           80 Pine Street, 38th Floor
           New York, New York 10005
           Via ECF